2015 CO 3

**Richard C. LAFOND, Petitioner**

v.

**Charlotte N. SWEENEY, Respondent**

**Supreme Court Case No. 12SC205**

Supreme Court of Colorado.

January 20, 2015

Attorneys for Petitioner: Don, Galleher & Saliman, P.C., Shelley B. Don, Watson W. Galleher, Mark E. Saliman, Denver, Colorado, Dean Neuwirth P.C., Dean Neuwirth, Denver, Colorado

Attorneys for Respondent: Burns Figa & Will, P.C., Jennifer M. Osgood, Raul Chacon, Jr., Greenwood Village, Colorado

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 In this case we must determine who in a dissolved limited liability company ("LLC") is entitled to the profits from a successful contingent fee case that was pending upon the dissolution of the company.[1] Attorneys Richard C. LaFond and Charlotte N. Sweeney formed LaFond & Sweeney LLC ("L & S") in 1995 pursuant to Colorado's Limited Liability Company Act ("LLC Act"), §§ 7–80–101 to –1101, C.R.S. (2014). L & S had several cases pending when it dissolved on June 1, 2008, including the subject of this action, the *Maxwell* case. LaFond and Sweeney were unable to reach an agreement on how to divide the profits that could come from the successful completion of the case. Sweeney filed an attorneys' lien on any profits derived from the case. LaFond then brought suit against Sweeney seeking a declaratory judgment for the full amount of the contingent fee. Sweeney filed a counterclaim to enforce the attorneys' lien.

¶ 2 In the declaratory judgment suit, the trial court found that the *Maxwell* case was an asset of L & S and valued it using a quantum meruit approach based upon the number of hours L & S had worked on the case pre-dissolution, multiplied by L & S's

---

1. We granted certiorari in *LaFond v. Sweeney,* 2012 COA 27, 345 P.3d 932, to review the following issues:

1. Whether the court of appeals' holding that a contingent fee earned by an attorney who previously represented the client in a dissolved law firm is an asset of the dissolved firm is inconsistent with Colorado law limiting discharged contingency fee attorneys to a quantum meruit recovery in order to promote the public policy of protecting the client's unfettered right to be represented by counsel of his own choice.

2. If the contingent fee is an asset of the dissolved firm, whether the new firm completing the work should receive compensation for the reasonable value of its post-dissolution work in successfully completing the case.

hourly fee rate. The trial court concluded that Sweeney could only recover half of this amount in accordance with LaFond and Sweeney's profit sharing agreement. Sweeney appealed, and the court of appeals reversed. It concluded that the *Maxwell* case was unfinished business of the LLC and all profit derived therefrom belonged to the LLC subject to division according to LaFond and Sweeney's profit sharing agreement. LaFond petitioned us for certiorari. We now affirm the judgment of the court of appeals. We hold that any profit derived from the *Maxwell* case belongs to L & S and must be divided between LaFond and Sweeney according to their profit sharing agreement. LaFond is not entitled to additional compensation for his post-dissolution work on the case.

## I.

¶ 3 In 1995, attorneys Richard C. LaFond and Charlotte N. Sweeney formed LaFond & Sweeney LLC pursuant to Colorado's LLC Act. Although L & S never had a written operating agreement, at the time of formation the parties orally agreed to a 60/40 split of all L & S profits, irrespective of the parties' actual workloads. In July 2002, the parties orally agreed to a 50/50 split of profits.

¶ 4 In either 2003 or 2004, a former client of LaFond, Bobby Maxwell, shared with LaFond facts regarding a false reporting claim against Kerr–McGee Oil & Gas Corporation. LaFond agreed to represent Maxwell, on behalf of L & S, with the assistance of co-counsel Michael Porter, an attorney with experience under the False Claims Act, 31 U.S.C. §§ 3729–3733, (2012). In May 2004, L & S, Porter, and Maxwell executed a written contingent fee agreement in connection with this qui tam whistle-blower case brought under the False Claims Act in a suit titled *United States ex rel. Maxwell v. Kerr–McGee Oil & Gas Corporation*, No. 04–CV–01224–MSK–CBS (D.Colo.). The contingent fee agreement provided notice to the client of the lawyers' quantum meruit rights. In June 2007, L & S, Porter, and Maxwell amended the contingent fee agreement to add appellate counsel Reilly, Pozner & Connelly.

¶ 5 When L & S dissolved on June 1, 2008, LaFond and Sweeney agreed to divide L & S's pending cases so that each would continue to represent those clients for which he or she had been primarily responsible. They sent letters to L & S's clients advising them that the firm was dissolving and, while the L & S attorney who had primarily handled their cases would continue as their attorney, the client had the right to choose his or her own attorney or obtain another attorney. Maxwell chose LaFond to continue his representation; Sweeney performed no post-dissolution work on *Maxwell*. While LaFond and Sweeney were able to agree on some of the issues affected by dissolution, they were unable to agree on the division of the fees that might ultimately be earned from the *Maxwell* case. Sweeney filed a notice of attorneys' lien on behalf of L & S and herself to protect their interest in any fees, costs, or reimbursements that might be generated by the *Maxwell* case, among others.

¶ 6 LaFond filed an action for declaratory relief against Sweeney to determine how any potential fees from the *Maxwell* case should be distributed. Sweeney answered, joined L & S as a party, and filed counterclaims, including a request to enforce the attorneys' lien. At the time of dissolution, L & S had expended over 1600 hours on the *Maxwell* case. As of trial in the case before us, LaFond had worked an additional 68 hours on the case.

¶ 7 On July 5, 2010, the trial court issued its order, concluding that (1) the *Maxwell* case had been an asset of the law firm; (2) the value of the case as the firm's asset was its value when the law firm dissolved on June 1, 2008; (3) the value was to be determined by a calculation based on work that was done and costs that were advanced as of June 1, 2008; (4) this calculation multiplied the number of hours worked by the hourly billing rate, which amounted to $536,636.50 in fees, with added costs of $60,543.38, resulting in a total of $597,179.88; (5) the oral agreement between LaFond and Sweeney required that any "profit" from the case be divided equally; therefore, (6) if LaFond recovered contingent fees from the *Maxwell* case, Sweeney would

be entitled to one-half of them up to a ceiling of $597,179.88, or a maximum of $298,589.94.

¶ 8 On September 16, 2010, shortly after the trial court entered its order in LaFond's declaratory judgment suit, the United States District Court for the District of Colorado, on remand from the Tenth Circuit Court of Appeals, entered judgment in favor of Maxwell and against Kerr–McGee Oil & Gas in the amount of approximately $23 million. Both parties appealed from the judgment. On June 2, 2011, the district court awarded Maxwell approximately $2.2 million in attorneys' fees and costs, which included hours and costs expended by L & S prior to dissolution, as well as the hours expended by LaFond post-dissolution. Ultimately, the parties reached a settlement agreement under which Maxwell received roughly $26 million, including approximately $2.6 million in attorneys' fees and costs. In addition to the contingent fee, LaFond received statutory fees and costs for the time L & S and LaFond spent on the case.

¶ 9 Sweeney appealed the trial court's order. The court of appeals reversed. It held that the trial court should have awarded LaFond and Sweeney each one-half of the profits allocated to LaFond from the *Maxwell* case, in accordance with their profit sharing agreement in place at the time of dissolution. The court's holding derived from three principles: (1) cases belong to clients, not to attorneys or law firms; (2) when attorneys handle contingent fee cases to successful resolution, they have enforceable rights to the contingent fee; and (3) a contingent fee may constitute an asset of a dissolved law firm organized as an LLC. Additionally, the court of appeals held that LaFond did not have a right to additional compensation for his post-dissolution work on the *Maxwell* case. The court reached this holding by comparing language from the Colorado Uniform Partnership Act of 1997 ("UPA"), §§ 7–64–101 to –1206, C.R.S. (2014), which specifically allows for reasonable compensation for services rendered in winding up the business of the partnership, with the LLC Act, which does not contain such a provision. Based on this comparison, the court concluded that the legislature intended that winding up members or managers of an LLC should not receive additional compensation for their post-dissolution services.

¶ 10 We granted LaFond's petition. We affirm the judgment of the court of appeals.

. II.

¶ 11 We hold that any profit derived from the *Maxwell* case belongs to L & S and must be divided between LaFond and Sweeney according to their profit sharing agreement. LaFond is not entitled to additional compensation for his post-dissolution work on the case.

## A. Standard of Review

¶ 12 Whether a trial court or court of appeals has applied the correct legal standard to a case is a matter of law that we review de novo. *In re Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 897–98 (Colo.2008). Statutory interpretation is likewise a question of law we review de novo. *Id.* at 897. Our primary task when interpreting a statute is to determine and give effect to the intent of the legislature. *MDC Holdings, Inc. v. Town of Parker,* 223 P.3d 710, 717 (Colo.2010). Courts presume the legislature is aware of its own enactments and existing case law precedent. *Anderson v. Longmont Toyota, Inc.,* 102 P.3d 323, 330 (Colo.2004). When interpreting a statute, we look to the language employed and, if unambiguous, apply the statute as written, unless doing so would lead to an absurd result. *MDC Holdings,* 223 P.3d at 717. If the plain language is unambiguous and does not conflict with other statutory provisions, we look no further. *Frazier v. People,* 90 P.3d 807, 810 (Colo. 2004). Even in the face of statutory silence, questions of interpretation are governed by legislative intent. *Williams v. White Mountain Constr. Co.,* 749 P.2d 423, 428 (Colo. 1988).

## B. The Unfinished Business and No–Compensation Rules

¶ 13 Whether the "unfinished business rule" and the "no-compensation rule"

apply under the LLC Act are issues of first impression in Colorado. Under the unfinished business rule, contingent fees ultimately generated from cases pending at the time of dissolution of a law firm must be divided among the former law partners according to their fee-sharing arrangement. Under the no-compensation rule, partners are not entitled to additional compensation for their services in winding up a law firm. One of the foundational cases concerning these rules as applied to law firms is *Jewel v. Boxer*, 156 Cal.App.3d 171, 203 Cal.Rptr. 13 (1984). In *Jewel*, the California court of appeal held:

> [I]n the absence of a partnership agreement, the Uniform Partnership Act requires that attorneys' fees received on cases in progress upon dissolution of a law partnership are to be shared by the former partners according to their right to fees in the former partnership, regardless of which former partner provides legal services in the case after the dissolution.

*Id.* at 174, 203 Cal.Rptr. at 15. The court arrived at this conclusion due in part to the existence of a provision in California's partnership act that states no partner, except a surviving partner, is entitled to extra compensation for services rendered in completing unfinished business. *Id.* at 175, 203 Cal.Rptr at 16.

¶ 14 The majority of jurisdictions confronted with these issues have followed *Jewel* in concluding that pending contingency fee cases are the unfinished business of a dissolved law firm; therefore, any profit derived from such cases belongs to the law firm and not to an individual winding up partner. *See, e.g., In re Labrum & Doak, LLP*, 227 B.R. 391, 405–06 (Bankr.E.D.Pa.1998) (collecting cases); *Vowell & Meelheim, P.C. v. Beddow, Erben & Bowen, P.A.*, 679 So.2d 637, 640 (Ala.1996); *Young v. Delaney*, 647 A.2d 784, 789, 792 (D.C.1994); *Ellerby v. Spiezer*, 138 Ill.App.3d 77, 80–82, 92 Ill.Dec. 602, 605–06, 485 N.E.2d 413, 416–17 (1985). Determining whether the unfinished business and no-compensation rules apply in this case requires a review of Colorado's LLC Act.

## C. Colorado's LLC Act

¶ 15 The General Assembly enacted Colorado's Limited Liability Company Act in 1990, combining features of Colorado's limited partnership and corporation statutes. *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1000 (Colo.1998). The current LLC Act also includes some of the same basic features found in the Uniform Limited Liability Company Act of 1996 ("Model Act") drafted by the National Conference of Commissioners on Uniform State Laws. *Id.*

¶ 16 A dissolved LLC continues its existence for the sole purpose of completing "every other act necessary to wind up and liquidate its business and affairs." § 7–80–803(1)(e), C.R.S. (2014). Persons winding up an LLC may "discharge or provide for obligations of the limited liability company...." § 7–80–803.3(3), C.R.S. (2014). Members and managers of an LLC have a duty to

> (a) *Account to the [LLC] and hold as trustee for it any property, profit, or benefit derived by the member or manager in the conduct or winding up of the [LLC] business ... [and]*
>
> (b) Refrain from dealing with the [LLC] in the conduct or winding up of the [LLC] business as or on behalf of a party having an interest adverse to the [LLC]....

§ 7–80–404(1)(a)–(b), C.R.S. (2014) (emphasis added). Members and managers are required to "discharge [their] duties to the [LLC] and exercise any rights consistently with the contractual obligation of good faith and fair dealing." § 7–80–404(3).

¶ 17 Unlike Colorado's Uniform Partnership Law of 1931 ("UPL"), §§ 7–60–101 to –154, C.R.S. (2014), the UPA, and the Model Act, the LLC Act does not contain any provision granting members, managers, or surviving partners the right to additional compensation for their services in winding up an LLC. However, an LLC "shall reimburse a person who is or was a member or manager for payments made ... in the ordinary course of the business of the [LLC] or for the preservation of its business or property...." § 7–80–407, C.R.S. (2014).

¶ 18 Members or managers may include in the operating agreement any provisions regarding "the conduct of its business to the extent such provisions are consistent with law." § 7–80–108(1)(a), C.R.S. (2014). Oper-

ating agreements may be written or oral. § 7–80–102(11)(a), C.R.S. (2014). The provisions of an operating agreement "shall control over any provision of this article to the contrary," with limited exceptions. § 7–80–108(1)(a). "To the extent the operating agreement does not otherwise provide, this article shall control." *Id.*

> *To the extent that a member or manager or other person that is a party to, or is otherwise bound by, the operating agreement has duties, including, but not limited to, fiduciary duties, to a[n] [LLC] or to another member, manager, or other person that is a party to or is otherwise bound by an operating agreement, the duties of such member, manager, or other person may be restricted or eliminated by provisions in the operating agreement, as long as any such provision is not manifestly unreasonable.*

§ 7–80–108(1.5) (emphasis added).

### D. Application to This Case

¶ 19 Whether a pending contingency fee case is unfinished business of an LLC and whether winding up members or managers are entitled to additional compensation for their post-dissolution services are questions of first impression in Colorado. We are unaware of any Colorado case addressing these issues. Under such circumstances, we may look to the decisions of other jurisdictions as persuasive authority. *See, e.g., Showpiece Homes Corp. v. Assurance Co. of Am.,* 38 P.3d 47, 54 (Colo.2001) ("[I]n interpreting the [Colorado Consumer Protection Act] it is helpful to examine other states' interpretations of their consumer protection statutes.").

¶ 20 The applicability of the unfinished business rule and no-compensation rule are distinct issues we address separately. Although the court in *Jewel* relied, at least in part, on the no-compensation rule in finding that the unfinished business rule applied, *see* 203 Cal.Rptr. at 16, the no-compensation rule is not a legal predicate to adopting the unfinished business rule.

### 1. The Unfinished Business Rule

¶ 21 The unfinished business rule is based upon (1) the principle that law firms do not end upon dissolution but extend through the winding up period and (2) the fiduciary duties of members and managers of an LLC. *See Huber v. Etkin,* 58 A.3d 772, 779–80 (Pa.Super.Ct.2012). If the LLC Act requires application of the unfinished business rule–absent a contrary agreement–we must apply the plain language of the statute to the facts of this case. *See Dove Valley Bus. Park Assocs. v. Bd. of Cnty. Comm'rs,* 945 P.2d 395, 403 (Colo.1997) ("Absent constitutional infringement, it is not our province to rewrite the statutes."); *see also Braata, Inc. v. Oneida Cold Storage Co.,* 251 P.3d 584, 587 (Colo. App.2010) (noting that strong public policy "does not trump statutory plain language"). Accordingly, we look to the language of the LLC Act to determine whether the unfinished business rule applies in this case.

¶ 22 An LLC continues to exist after dissolution for the purpose of winding up its business, affairs, and obligations. § 7–80–803(1)(e); § 7–80–803.3(3). Members and managers of an LLC are required to "hold as trustee for [the LLC] any property, profit, or benefit derived ... in the conduct or winding up of the [LLC] business." § 7–80–404(1)(a). In order to determine who is entitled to the profit derived from the *Maxwell* case, we must first address whether a pending contingent fee case is business of a dissolved LLC. We answer this question in the affirmative.

¶ 23 That a pending contingency fee case is business of a dissolved LLC follows from the fiduciary nature of the attorney-client relationship. *See Olsen & Brown v. City of Englewood,* 889 P.2d 673, 675–76 (Colo.1995) (discussing the attorney-client relationship). With respect to law firms, absent a special agreement, the client employs the firm and not a particular lawyer. CBA Formal Ethics Op. 116 (2007). During the dissolution of a law firm, attorneys continue to owe clients ethical and legal duties such as ensuring that the client's matter is handled properly. *Id.* "Unless the relationship between a lawyer and client is terminated as provided in Colo. RPC 1.16, a lawyer should

carry through to conclusion all matters undertaken for a client." *Id.*[2]

¶ 24 Here, the *Maxwell* case was pending upon the dissolution of L & S and LaFond and Sweeney thereupon did what they were professionally obligated to do. They notified Maxwell that the firm was being dissolved and gave him the choice to decide which of them would continue to represent him in the *Maxwell* case. They jointly suggested that LaFond continue the representation in the *Maxwell* case. They also notified Maxwell that he was free to choose representation by entirely different counsel. Maxwell agreed to have LaFond continue the representation. Maxwell's choice in this regard did not alter the contingent fee agreement that was in existence at the time of L & S's dissolution; nor did it alter the rights and duties LaFond and Sweeney owed to each other under their business arrangement.[3] The contingent fee agreement remained in place, and LaFond had a duty to carry forward the representation undertaken by the LLC. Accordingly, the *Maxwell* case constituted business of the LLC for the purposes of determining the rights and duties of LaFond and Sweeney toward each other.

¶ 25 Our conclusion aligns with other jurisdictions that have determined that completing an executory contract is part of winding up a company's business. *See, e.g., Beckman v. Farmer,* 579 A.2d 618, 641–42 (D.C.1990); *Platt v. Henderson,* 227 Or. 212, 361 P.2d 73, 82 (1961); *Bader v. Cox,* 701 S.W.2d 677, 682 (Tex.App.1985). An executory contract is a "contract that remains wholly unperformed or for which there remains something still to be done on both sides." Black's Law Dictionary 369 (9th ed. 2009). Here, at the time of dissolution, the *Maxwell* contingent fee agreement was an executory contract because further legal services were required to bring the case to a conclusion and Maxwell would be required to pay his attorneys the contingency fee if he reached a favorable resolution of the case. *See In re Tonry,* 724 F.2d 467, 468 (5th Cir.1984) ("[A]n attorney's contingent fee contract is executory if further legal services must be performed by the attorney before the matter may be brought to a conclusion."). We agree with these other jurisdictions in reaching our determination that the *Maxwell* contingency fee agreement was an executory contract and therefore constituted business of the LLC.

¶ 26 Based upon the fiduciary duties of members and managers of an LLC, we conclude that any profit derived from the *Maxwell* case belongs to L & S, not the member or manager in charge of winding up the case. Fiduciary duties of members and managers continue to apply through the winding up process. *See Hooper v. Yoder,* 737 P.2d 852, 859 (Colo.1987) (determining that fiduciary duties between partners continue through the winding up of a partnership). In winding up *Maxwell,* LaFond helped reach a favorable settlement, thereby entitling himself and Sweeney to the benefit of the contingency fee, as well as statutory fees. Under section 7–80–404(1)(a) of the LLC Act, LaFond was required to "hold as trustee for [the LLC] any property, profit, or benefit derived . . . in the conduct or winding up of the [LLC] business. . . ." The *Maxwell* case was business of L & S, and the

---

2. Under the Colorado Rules of Professional Conduct, a lawyer may not withdraw from representing a client absent good cause. *See* Colo. RPC 1.16(b); *Anderson, Calder & Lembke v. Dist. Court,* 629 P.2d 603, 604–05 (Colo.1981). Withdrawal requires notice and a court order under C.R.C.P. 121 § 1–1(2)(b). Even if a lawyer has good cause to withdraw, a tribunal can order a lawyer to continue representation. Colo. RPC 1.16(c).

3. LaFond could not have had Maxwell discharge L & S in order to hire himself without violating his fiduciary duties to L & S and Sweeney. LaFond owed a duty to not convert business of the LLC for his own personal gain. § 7–80–404(1)(b); *see also* § 7–80–404(3) ("Each member and each manager shall discharge [their] duties to the [LLC] and exercise any rights consistently with the contractual obligation of good faith and fair dealing."); *Hooper v. Yoder,* 737 P.2d 852, 859 (Colo.1987) ("Partners in a business enterprise owe to one another the highest duty of loyalty; they stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing."); *Ellerby,* 92 Ill.Dec. 602, 485 N.E.2d at 416–17 (concluding that a partner is "not entitled to take any action with respect to the unfinished business leading to purely personal gain, such as having the client discharge the partnership and hire [the partner] individually").

contingency fee and statutory fees are profits derived from winding up L & S's business. Therefore, under the plain language of the statute, these profits belong to L & S to be distributed according to the profit sharing agreement that existed at the time of dissolution.

¶ 27 While the trial court found that the *Maxwell* case was an asset of L & S, it incorrectly concluded that the value of this asset was its value when L & S dissolved on June 1, 2008. The trial court calculated the value of the case by utilizing a quantum meruit approach–multiplying the number of hours worked pre-dissolution by the hourly billing rate. However, this approach ignores the continuous existence of the contingent fee agreement and the fiduciary duties owed by members and managers of an LLC to each other during dissolution, such as the requirement that members and managers hold as trustee for the LLC any profit derived in winding up the company's business. *See* § 7–80–404(a)(1). The equitable remedy of quantum meruit is designed to prevent clients from unfairly benefiting to the detriment of attorneys; quantum meruit restores fairness when a contract fails or when there is no express contract. *See Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444–45 (Colo.2000); *see also Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶¶ 24–27, 287 P.3d 842, 848–49 (concluding that a withdrawing attorney may sue co-counsel in a contingency fee case under a quantum meruit theory if co-counsel ultimately receives the contingency fee). Here, none of the parties ever terminated the *Maxwell* contingency fee agreement, Maxwell continued to have representation in the case agreeable to him even during the dissolution of the LLC, and a quantum meruit recovery action vis-à-vis the client never properly arose in this case. The underlying basis for applying this equitable doctrine regarding fee recovery is absent here.

¶ 28 Instead of focusing on whether the *Maxwell* case was an asset of L & S at the time of dissolution, the trial court should have analyzed whether the *Maxwell* case was business of L & S that LaFond and/or Sweeney were required to wind up post-dissolution. The value of the *Maxwell* case at the time of dissolution is immaterial because any profit derived from winding up L & S's business belongs to L & S under the plain language of the LLC Act.

¶ 29 LaFond argues that adopting the unfinished business rule violates a client's unfettered right to counsel of his choice. He claims that an attorney would be unwilling to represent the client unless the attorney is entitled to additional compensation for his work. In support of this argument, LaFond observes that an attorney may ethically withdraw from representing a client if the representation will impose an unreasonable financial burden on the lawyer. Colo. RPC 1.16(b)(6). Accordingly, LaFond contends that a quantum meruit approach would better serve the client because the client would be able to choose the preferred attorney from the dissolving law firm without fear that the attorney might withdraw from representation due to financial hardship. We disagree.

¶ 30 We are unaware of any authority for the proposition that fiduciary duties attorneys owe to their firms may be eschewed under the circumstances of a case like the one before us. The division of the contingent fee between LaFond and Sweeney does not affect the amount of money Maxwell had to pay upon successful resolution of his case. Hypothetical harm, as opposed to actual harm to the client's ability to choose counsel in the case, is not a pertinent consideration when determining the rights and obligations of attorneys to their firms. *See Jewel*, 203 Cal.Rptr. at 17 ("[T]he right of a client to the attorney of one's choice and the rights and duties as between partners with respect to income from unfinished business are distinct and do not offend one another.").

¶ 31 In addition, LaFond's argument fails to acknowledge that courts may help preserve a client's interest in retaining his or her counsel of choice. Even if an attorney has good cause to withdraw from representation, C.R.C.P. 121 § 1–1(2)(b) requires notice and a court order allowing the attorney to withdraw. A tribunal can order a lawyer to continue representation despite good cause for withdrawal. Colo. RPC 1.16(c). An at-

torney does not have an unfettered right to withdraw from representation due to financial concerns.

¶ 32 Moreover, there are compelling reasons for applying the unfinished business rule over the quantum meruit approach La-Fond argues for. The unfinished business rule prevents members or managers from competing for the most lucrative cases during the life of the LLC in hopes that they might retain those cases if the LLC dissolves. *See Jewel,* 203 Cal.Rptr. at 18. Additionally, it discourages members and managers of a dissolving LLC from scrambling to seize client files and solicit clients. *Id.* The quantum meruit approach LaFond favors would undercut the fiduciary duties that members and managers of an LLC owe to each other. *See Fox v. Abrams,* 163 Cal. App.3d 610, 616–17, 210 Cal.Rptr. 260, 265–66 (1985).

¶ 33 There is nothing fundamentally unfair about the effect of the unfinished business rule–members and managers will receive, in addition to the portion of income they derive from winding up the LLC, their share of income generated by the work of other members and managers in winding up the LLC. *See id.* at 265. If they desire to make other arrangements, members and managers of an LLC may include in their operating agreement provisions addressing how to distribute contingency fees realized post-dissolution. *See* § 7–80–108. The LLC Act specifically allows members and managers to restrict or eliminate fiduciary duties provided by the Act through an operating agreement if they desire to do so. § 7–80–108(1.5); *see also Jewel,* 203 Cal.Rptr. at 19. LaFond's argument places all of the risk of the contingency on the LLC while depriving it of the potential benefit of the contingent fee agreement with the client. A contingent fee "is designed to be greater than the reasonable value of the services ... to reflect the fact that attorneys will realize no return for their investment of time and expenses in cases they lose." *Brody v. Hellman,* 167 P.3d 192, 201 (Colo.App.2007).

¶ 34 In making his arguments, LaFond relies on two cases from other jurisdictions: *In re . Thelen LLP,* 24 N.Y.3d 16, 995 N.Y.S.2d 534, 20 N.E.3d 264 (2014), and *Wel-man v. Parker,* 328 S.W.3d 451 (Mo.Ct.App. 2010). However, neither of these cases addresses the specific language used in Colorado's LLC Act. Besides, both cases are distinguishable.

¶ 35 In *Thelen,* New York's highest court held that "pending hourly fee matters are not partnership 'property' or 'unfinished business' within the meaning of New York's Partnership Law." 24 N.Y.3d at 22, 995 N.Y.S.2d at 536–37, 20 N.E.3d at 266–67. The court concluded that "no law firm has a property interest in future hourly legal fees because they are too contingent in nature and speculative to create a present or future property interest given the client's unfettered right to hire and fire counsel." *Id.,* 24 N.Y.3d at 28, 995 N.Y.S.2d at 540–41, 20 N.E.3d at 270–71 (internal quotations and citations omitted). The court indicated in dicta, to the extent contingency fee cases are assets of a law firm, the value of the asset is to be determined at the time of dissolution. *Id.,* 24 N.Y.3d at 28–29, 995 N.Y.S.2d at 541, 20 N.E.3d at 271. However, the relevant question here is whether the *Maxwell* case is business of L & S; if it is, then LaFond must hold in trust for L & S any profit derived from that case under the plain language of the LLC Act.

¶ 36 In *Welman,* a client entered into a contingent fee agreement with a law firm, and later the partner primarily responsible for the client's case left the law firm. 328 S.W.3d at 453–54. When the partner left, the client terminated the law firm's contingent fee contract and entered into a subsequent contingent fee contract with the partner's new law firm. *See id.* at 454, 458. Thus, unlike the case before us, the court in *Welman* found that the client had terminated representation by the law firm and entered into a new contract with a different law firm. Additionally, the court in *Welman* took issue with the trial court's reasoning that a partner is "not entitled to have the client discharge the partnership and hire the partner individually" by proclaiming that this statement "contradicts the fundamental right of clients to freely choose their counsel." *Id.* at 454, 457. However, this statement, as argued by LaFond in the case before us, confuses the client's right to discharge an attorney or law firm at will with the fiduciary duties of attor-

neys toward each other and their law firm. Under Colorado law, members and managers of an LLC cannot act to induce or persuade a client to discharge the LLC for the benefit of a particular member or manager of the LLC to the exclusion of the others; they breach their fiduciary duties to the LLC if they attempt to do so.

¶ 37 We must apply the LLC Act as written by the General Assembly. The fiduciary duties in the LLC Act militate against members and managers seeking personal gain at the expense of the firm. Accordingly, we conclude that LaFond and Sweeney must split L & S's portion of the contingency fee and any other profits obtained from the *Maxwell* case, including statutory attorneys' fees, according to their verbal profit sharing agreement in the absence of an operating agreement that provides otherwise.

### 2. The No–Compensation Rule

■ ¶ 38 LaFond contends that, even if the unfinished business rule applies, he is entitled to additional compensation for his services in winding up the *Maxwell* case. We disagree. In contrast to Colorado's Uniform Partnership Law of 1931, Colorado's Uniform Partnership Act of 1997, and the Model Act of 1996, Colorado's 1990 LLC Act does not contain a provision allowing for additional compensation under any circumstances for services performed in winding up a law firm's business. In the absence of a contrary arrangement in the operating agreement, LaFond is not entitled to additional compensation for his post-dissolution work on the *Maxwell* case.

¶ 39 LaFond argues that the silence in the LLC Act on the issue of additional compensation should be construed, in light of the 1931 UPL, to allow additional compensation. We disagree. Although the 1990 LLC Act is modeled in part on Colorado's partnership statutes, the LLC Act differs from the 1931 UPL because the UPL explicitly allows for additional compensation to winding up partners in certain circumstances while the LLC Act does not explicitly allow compensation to winding up members or managers in any circumstance. Under the UPL, "[n]o partner is entitled to remuneration for acting in

the partnership business, but a surviving partner is entitled to reasonable compensation for the partner's services in winding up the partnership affairs." § 7–60–118(1)(f), C.R.S. (2014). Therefore, this section explicitly allows for additional compensation to winding up partners in certain circumstances. We may infer that the absence of language in the LLC Act allowing for additional compensation to any winding up member or manager was an intentional legislative choice. *See People v. Seacrist,* 874 P.2d 438, 440 (Colo.App.1993) (explaining that courts apply "the presumption that the General Assembly was aware that qualifying language could be added to limit application of the statute ... and that it would have done so if such had been its intent").

■ ¶ 40 LaFond argues that "[i]n 1990, the 1931 UPL expressly provided that a winding-up partner was not entitled to extra compensation. Omitting the 1931 UPL's language from the LLC Act compels a presumption that the General Assembly intended to exclude the 'no-compensation' rule from the LLC Act." LaFond's argument misstates the language of the UPL and ignores the plain language of the LLC Act. The 1931 UPL explicitly allows additional compensation to winding up partners, albeit in limited circumstances. Furthermore, the LLC Act states that winding up members and managers must hold as trustee for an LLC any profit derived from winding up an LLC's business. § 7–80–404(a)(1). As we explain in this opinion, receiving a contingency fee and statutory fees in the underlying case are profits LaFond obtained from winding up L & S's business. Any indication that a winding up member or manager is entitled to additional compensation for his or her post-dissolution work is conspicuously absent in the LLC Act, and "[w]e do not add words to a statute." *Boulder Cnty. Bd. of Comm'rs v. HealthSouth Corp.,* 246 P.3d 948, 951 (Colo.2011).

¶ 41 A review of the UPA, Model Act, and the LLC Act's amendments further demonstrate that the General Assembly intended the no-compensation rule to apply under the

LLC Act.[4] The LLC Act has been amended several times, notably, after the publication of the Model Act and the enactment of the UPA. When amending the LLC Act, the General Assembly did not include language granting members or managers the right to additional compensation for their services in winding up an LLC's business. The legislature's inclusion of such language in the UPA, as well as the language in the Model Act, stand in sharp contrast to the absence of such language in the LLC Act. We conclude the General Assembly intended a different rule for the LLC Act.

¶ 42 In 2004, the legislature amended the LLC Act to include section 7–80–404, which states that members and managers of an LLC have a duty to

> [a]ccount to the [LLC] and hold as trustee for it any property, profit, or benefit derived by the member or manager in the conduct of winding up of the [LLC] business or derived from a use by the member or manager of property of the [LLC], including the appropriation of an opportunity of the [LLC].

*See* ch. 263, pt. 4, § 7–80–404(1)(a), 2004 Colo. Sess. Laws 939. In 2006, the legislature again amended the LLC Act, including the addition of section 7–80–803.3, which describes the right to wind up LLC business. *See* ch. 192, sec. 36, § 7–80–803.3, 2006 Colo. Sess. Laws 863–64. This section parallels language from the Model Act.[5] In these amendments, the General Assembly declined to add language that would entitle members or managers to additional compensation for their services in winding up an LLC.

¶ 43 In between the enactment of the LLC Act and the 2004 and 2006 amendments, two significant events occurred. First, in 1996, the National Conference of Commissioners on Uniform State Laws published the Model Act. Unlike Colorado's LLC Act, the Model Act explicitly states that members are entitled to additional compensation for services performed in winding up the LLC business. *See* Unif. Ltd. Liab. Co. Act § 403(d) (1996) ("A member is not entitled to remuneration for services performed for a limited liability company, except for reasonable compensation for services rendered in winding up the business of the company."). Although the General Assembly's 2006 amendments to the LLC Act incorporated some elements from the Model Act, the amendments did not include the language from the Model Act that would entitle members or managers to additional compensation for services performed in winding up an LLC's business. Second, in 1997, the General Assembly enacted the UPA, which explicitly states that a partner is entitled to additional compensation for services performed in winding up the business of the partnership. *See* § 7–64–401(8), C.R.S. (2014) ("A partner is not entitled to remuneration for services performed for the partnership except for reasonable compensation for services rendered in winding up the business of the partnership."). If it wished, the legislature could have included language that would give members or managers the right to additional compensation for their services in winding up the LLC, but it did not do so in the original LLC Act or its subsequent amendments. *See City & Cnty. of Denver v. Rinker*, 148 Colo. 441, 446, 366

---

**4.** LaFond argues that, because the LLC Act predates the UPA, the court of appeals erred when it held that the exclusion of the UPA language from the LLC Act was an "intentional legislative choice." However, the language used in the UPA still informs our analysis because the legislature has significantly amended the LLC Act since it enacted the UPA.

**5.** *Compare* LLC Act § 7–80–803.3(3):

> A person winding up a[n] [LLC's] business may preserve the business or property as a going concern for a reasonable time, prosecute and defend actions and proceedings, whether civil, criminal, or administrative, settle disputes, settle and close the [LLC's] business, dispose of

and transfer the [LLC's] property, discharge or provide for obligations of the [LLC], distribute the assets of the [LLC] pursuant to section 7–80–803(1)(d), and perform other necessary acts.

*with* Unif. Ltd. Liab. Co. Act § 803(c) (1996):

> A person winding up a[n] [LLC's] business may preserve the company's business or property as a going concern for a reasonable time, prosecute and defend actions and proceedings, whether civil, criminal, or administrative, settle and close the company's business, dispose of and transfer the company's property, discharge the company's liabilities, distribute the assets of the company pursuant to Section 806, settle disputes by mediation or arbitration, and perform other necessary acts.

P.2d 548, 550 (1961) ("[T]here is a presumption that all laws are passed with knowledge of those already existing....").

¶ 44 In sum, the absence of language in the LLC Act granting members and managers the right to additional compensation for their post-dissolution services under any circumstances demonstrates the legislature's intent not to grant winding up members or managers a right to additional compensation.

### Conclusion

¶ 45 We conclude that (1) an LLC continues to exist after dissolution to wind up its business; (2) upon dissolution, pending contingency fee cases are an LLC's business; (3) absent an agreement to the contrary, all profits derived from winding up the LLC's business belong to the LLC to be distributed in accordance with the members' or managers' profit sharing agreement; and (4) the LLC Act does not grant winding up members or managers the right to receive additional compensation for their services in winding up LLC business.

### III.

¶ 46 Accordingly, we affirm the judgment of the court of appeals.