25CA1097 Bruschi v 24 Hour Fitness 04-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1097
Arapahoe County District Court No. 24CV227
Honorable Thomas Henderson, Judge

---

Denise Bruschi,

Plaintiff-Appellant,

v.

24 Hour Fitness USA, LLC d/b/a 24 Hour Fitness,

Defendant-Appellee.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 9, 2026

---

Denise Bruschi, Pro Se

Dietze and Davis, P.C., William A. Rogers, III, Nathan A. Klotz, Lauren N. Davis, Boulder, Colorado, for Defendant-Appellee

¶ 1     This case arises from a complaint Denise Bruschi filed against 24 Hour Fitness (24 Hour), after she allegedly sustained a severe injury while exiting its facility. 24 Hour filed a motion to dismiss, which the district court converted to a motion for summary judgment. After full briefing, the court granted the motion. Bruschi appeals that judgment. We affirm.

## I.     Background

¶ 2     The following factual recitation is gathered from the parties' pleadings and evidentiary submissions and the undisputed facts acknowledged by the parties and accepted by the district court.

¶ 3     24 Hour is a commercial establishment that provides various equipment and instructional programs focused on achieving physical fitness. Bruschi, a senior citizen, was a member of 24 Hour and thus allowed to use 24 Hour's fitness facilities. Bruschi's membership was apparently part of a Medicare-funded program designed to encourage fitness activities by senior citizens. Incident to becoming a member, Bruschi signed a release agreement (the waiver) that included the following language:

> RELEASE OF LIABILITY AND ASSUMPTION
> OF RISK

1

Using the 24 Hour Fitness, USA, Inc. (24 Hour) facilities involves the risk of injury to you or your guest, whether you or someone else causes it. Specific risks vary from one activity to another and the risks range from minor injuries to major injuries, such as catastrophic injuries including death. **In consideration of your use of 24 Hour's facilities and/or participation in the activities offered by 24 Hour, <u>you understand and voluntarily accept this risk and agree that 24 Hour</u>, its officers, directors, employees, volunteers, agents and independent contractors <u>will not be liable for any injury</u>, or any other damages, to you, your spouse, guests, unborn child, or relatives resulting from the actions or inactions, including negligence, of 24 Hour or anyone on 24 Hour's behalf or anyone using the facilities, including, without limitation, personal, bodily, or mental injury, or economic loss, <u>whether said use or said injury is related to exercise or not and whether using 24 Hour's services on its premises or not</u>. This Release of Liability includes, without limitation, claims against 24 Hour for negligence, premises liability, and products liability.** Further, you understand and acknowledge that 24 Hour does not manufacture fitness or other equipment at its facilities, but purchases and/or leases equipment. You understand and acknowledge that 24 Hour is providing recreational services and may not be held liable for defective products.

¶ 4     The timeline below summarizes Bruschi's activities on the morning of December 26, 2022:

- 7:21 a.m.: Bruschi arrived at 24 Hour.

- 7:21 a.m. to approximately 9 a.m.: Bruschi worked out or otherwise used 24 Hour's facilities.

- 9 a.m. or shortly before: Bruschi completed her workout and walked through 24 Hour's front lobby and into iCryo, a business that is separate from 24 Hour, but which is accessible from 24 Hour's lobby. While at iCryo, Bruschi completed red-light therapy, a fifteen-minute session designed to achieve desired health and beauty benefits.

- 9:15 a.m. or shortly thereafter: Bruschi completed her red-light therapy at iCryo, which did not have a bathroom facility on its premises. Bruschi then walked through iCryo's lobby and through 24 Hour's adjoining lobby to use 24 Hour's bathroom.

- Approximately 9:15 to 9:30 a.m.: After using the bathroom, Bruschi walked through 24 Hour's lobby toward the exit. Shortly before reaching the door, Bruschi slipped and fell on the wet tile floor. As a consequence of the fall, Bruschi fractured her patella.

- After 9:30 a.m.: Subsequent to her fall, Bruschi was tended to by 24 Hour personnel. Bruschi alleges that the responding 24 Hour staff were untrained in medical matters and used a refrigerated, canned drink in an attempt to reduce the swelling and pain in her knee. Eventually, Bruschi was escorted back to iCryo, where an iCryo nurse gave her an IV solution in an effort to temper her nausea. Thereafter, Bruschi was assisted to her vehicle. During this time, no ambulance was called and no trained emergency responders were on scene.

¶ 5 Bruschi was eventually seen at Swedish Medical Center and diagnosed with a fractured patella. She underwent surgery to repair the fracture on January 5, 2023.[1]

---

[1] Bruschi notes that 24 Hour has criticized some of her allegations as factually unsupported, while at the same time 24 Hour has not produced certain information — such as incident reports and videos of the incident — that may exist and support her claim. But because of the procedural posture of this case, no discovery or disclosures have yet occurred. And for purposes of this appeal, 24 Hour concedes that Bruschi has alleged and factually supported a viable claim under the Premises Liability Act. *See* § 13-21-115, C.R.S. 2025. Therefore, we do not need to address Bruschi's nondisclosure contentions, and we instead focus on the waiver issue.

¶ 6    In her original complaint, Bruschi alleged separate claims for common law negligence and violation of the Premises Liability Act (PLA).  24 Hour moved to dismiss, arguing that the negligence claim was superseded by the PLA and that the PLA claim was barred by the waiver, which 24 Hour attached to its motion.  Bruschi moved to amend her complaint to dismiss the negligence claim and to submit additional exhibits.  The court granted that request and subsequently converted 24 Hour's motion to dismiss into a motion for summary judgment.  After the completion of briefing, the district court entered summary judgment in favor of 24 Hour, concluding that the waiver was enforceable and extended to Bruschi's claims.

¶ 7    Bruschi appeals the district court's final judgment.

## II.    Enforceability of the Waiver

¶ 8    We begin our analysis by setting forth the applicable standard of review and controlling law.  We then turn to the parties' specific arguments raised on appeal.

### A.    Applicable Law

#### 1.    Standard of Review

¶ 9    We review a district court's interpretation of a written contract de novo.  *Shive v. 24 Hour Fitness USA, LLC*, 2025 COA 87, ¶ 13.

Likewise, we review a district court's grant of summary judgment de novo. *Bryant v. Cmty. Choice Credit Union*, 160 P.3d 266, 276 (Colo. App. 2007).

¶ 10 Summary judgment is only appropriate when there are "no disputed issue[s] of material fact and the moving party is entitled to judgment as a matter of law." *Chase v. Farmers Ins. Exch.*, 129 P.3d 1011, 1014 (Colo. App. 2004). "The moving party has the initial burden to show that there is no genuine issue as to material fact, but once that initial burden is met, the burden shifts to the nonmoving party to show that there is a triable issue of fact." *Bryant*, 160 P.3d at 276 (citing *McCormick v. Union Pac. Res. Co.*, 14 P.3d 346 (Colo. 2000)). "In determining whether summary judgment is proper, we grant the nonmoving party any favorable inferences reasonably drawn from the evidence, and we resolve all doubts in favor of the nonmoving party." *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1216 (Colo. App. 2010).

## 2. Pro Se Pleadings

¶ 11 "Pleadings by pro se litigants must be broadly construed to ensure that they are not denied review of important issues because of their inability to articulate their argument like a lawyer." *Jones*

*v. Williams*, 2019 CO 61, ¶ 5. While doing so, however, we may not rewrite a pro se litigant's arguments, advocate for them, or invent arguments not made. *See People v. Cali*, 2020 CO 20, ¶ 34. Moreover, pro se litigants must comply with the same procedural rules as licensed attorneys. *See Adams v. Sagee*, 2017 COA 133, ¶ 10.

### 3. Exculpatory Agreements

¶ 12 Exculpatory agreements "have long been disfavored." *Stone v. Life Time Fitness, Inc.*, 2016 COA 189M, ¶ 14 (quoting *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo. 1998)). The enforceability of an exculpatory agreement presents a question of law that we review de novo. *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 948 (Colo. App. 2011). "[I]n no event will such an agreement provide a shield against a claim for willful and wanton negligence." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). An agreement designed to shield a party from liability "for his own simple negligence is also disfavored, [but] it is not necessarily void" provided that "one party is not 'at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.'" *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465,

467 (Colo. 2004) (quoting *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989)).

¶ 13    Because of their disfavor, exculpatory agreements require "additional consideration" and "must be strictly construed against the party seeking to limit its liability." *McShane v. Stirling Ranch Prop. Owners Ass'n*, 2017 CO 38, ¶ 18.  Our close scrutiny is designed "to ensure that the intent of the parties is expressed in clear and unambiguous language and that the circumstances and the nature of the service involved indicate that the contract was fairly entered into." *Chadwick*, 100 P.3d at 467.

¶ 14    The supreme court has established a four-factor test to determine whether a contractual exculpatory clause is enforceable: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376.

¶ 15    A division of the court of appeals addressed the enforceability of an exculpatory clause in the context of an injury suffered at a fitness center in *Stone*.  In that case, one of the fitness center's members, after washing her hands in the bathroom, tripped on a

hairdryer cord and sustained injuries to her ankle.  *Stone*, ¶¶ 3-4.

The member alleged that the exculpatory clause she had signed did

not extend to negligently maintained restrooms in the fitness club,

and that the exculpatory clause's application to such circumstances

was unclear.  *Id.* at ¶¶ 4-7.  The division concluded that the

exculpatory clause was not clear and did not "unequivocally bar

Stone's PLA claim based on the injuries she allege[d] she

sustained."  *Id.* at ¶ 35.  Accordingly, it reversed the district court's

summary judgment.  *Id.*

¶ 16     The division in *Stone* briefly analyzed the first three *Jones*

factors and ultimately concluded that "no public duty is implicated

if a business provides recreational services."  *Id.* at ¶ 16.  In

reaching this conclusion, the division cited supreme court cases

holding that guided hunting trip services and skydiving do not

implicate a public duty.  *See Chadwick*, 100 P.3d at 467; *Jones*,

623 P.2d at 376-78.  Citing similar authority, the division

concluded that "recreational services [are] neither essential nor a

matter of practical necessity."  *Stone*, ¶ 17.  As to the third factor,

the division concluded that the provision of recreational services

9

does not present an unfair disparity in bargaining power between the parties.  *Id.* at ¶ 18.

¶ 17    Nonetheless, the division in *Stone* found the exculpatory clause unenforceable based on the fourth *Jones* factor.  Specifically, the division concluded that the exculpatory clause at issue in that case focused on "injury related to fitness activities, as opposed to washing one's hands."  *Id.* at ¶ 30.  Thus, the court found it inapplicable to the injuries Stone suffered while washing her hands in the bathroom.  *Id.* at ¶ 35.

¶ 18    In *Shive*, a division of this court again addressed the enforceability of an exculpatory clause in the context of a fitness center.  At issue in *Shive* was the identical waiver at issue in this case.  There, a 24 Hour member fell on the icy sidewalk just outside 24 Hour's exit door as he proceeded to his car.  *Shive*, ¶ 6.  The division concluded that the identical waiver did "not express an intention of Shive and 24 Hour to waive 24 Hour's liability for risks outside the club building 'in clear and unambiguous language.'"  *Id.* at ¶ 45 (quoting *Jones*, 623 P.2d at 376).  Thus, the division reversed the district court's decision that the identical waiver barred Shive's PLA claim.  *Id.* at ¶¶ 46-48.

¶ 19    In reaching this conclusion, the division focused on the fourth

*Jones* factor, stating:

> We agree with 24 Hour that the exculpatory
> clause waives liability for claims arising from a
> slip and fall that occurred within its "facilities"
> — the recreational spaces located inside its
> building, such as a gym floor, a basketball
> court, a pool deck, or a wet locker room floor.
> But the mere reference to "premises liability"
> in the exculpatory clause does not overcome
> the clause's clear limiting language or expand
> its scope to cover claims arising from injuries
> sustained outside the club building.

*Id.* at ¶ 43. Because it rejected 24 Hour's argument based on the

fourth *Jones* factor, the division did not address whether the

identical waiver was "invalid as matter of public policy." *Id.* at ¶ 47.

¶ 20    In another recent case, the supreme court considered whether

a father's execution of an exculpatory clause on behalf of his minor

child barred her claims against a ski resort under both negligence

per se and common law negligence theories. *Miller v. Crested Butte,*

*LLC*, 2024 CO 30, ¶¶ 1-3. *Miller* involved a minor child who was

unable to get properly seated on an automatic ski lift. *Id.* at ¶ 9.

As a result, she was dangling from the chair as the lift ascended the

mountain, and there was no lift attendant or operator present to

slow or stop the lift. *Id.* The child eventually fell thirty feet and

11

sustained serious injuries. *Id.* at ¶¶ 9-10. The father brought a suit against the ski resort on his daughter's behalf alleging, among other claims, a negligence per se claim. *Id.* at ¶ 11.

¶ 21 The supreme court determined that the ski resort was bound by state regulations regarding the use of ski lifts, which required lift attendants to monitor and assist passengers, including slowing or stopping the lift if necessary. *Id.* at ¶ 30. Because of these specific regulations, which the resort was obligated by statute to abide, the supreme court concluded that the exculpatory clause did not bar the claims. *Id.* at ¶ 43. In reaching this conclusion, the court reasoned as follows:

> First, settled precedent from this court has established that a party cannot discharge its obligation to perform a statutory duty by way of an exculpatory agreement. *See, e.g., Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo. 1998) ("Parties may not privately contract to abrogate statutory requirements or contravene the public policy of this state."); *Gonzales v. Indus. Comm'n,* 740 P.2d 999, 1002 (Colo. 1987) ("Private parties may not by agreement or rule render ineffectual the rules and standards provided by statute.").

*Id.* at ¶ 36.

¶ 22    Bruschi also cites *Walters v. YMCA*, a case from the Appellate Division of the Superior Court of New Jersey. 96 A.3d 323 (N.J. Super. Ct. App. Div. 2014). Although case law from other jurisdictions is not binding on us, we may consider it for its persuasive value. *See People v. Weiss*, 133 P.3d 1180, 1187 (Colo. 2006) ("Although not binding as precedent, we may look to decisions of other jurisdictions for persuasive guidance on matters that are of first impression to us."). In *Walters*, the plaintiff suffered an injury from a negligently maintained stair tread that led to an indoor swimming pool. 96 A.3d at 324. The New Jersey appellate court determined that the exculpatory agreement Walters had signed did not apply to the injury he sustained after slipping on the staircase because the injury had not occurred while using exercise equipment in the building or while exercising. *Id.* at 328-29. In reaching this conclusion, the court reasoned as follows: "Any ambiguities in language about the scope of an exculpatory agreement's coverage, or doubts about its enforceability, should be resolved in favor of holding a tortfeasor accountable. 'The law does not favor exculpatory agreements because they encourage a lack of care.'" *Id.* at 328 (citations omitted).

¶ 23 It should be noted that the Appellate Division of the Superior Court of New Jersey was applying New Jersey common law concerning negligence claims. In Colorado, however, common law negligence claims have been usurped by the PLA. *See Vigil v. Franklin,* 103 P.3d 322, 329-30 (Colo. 2004) (concluding that the PLA abrogated common law negligence duties applicable to landowners and common law defenses to the existence of such duties).

### 4 PLA Duty to Invitees

¶ 24 Under the PLA, a landowner owes defined duties to a person on their premises, depending on the purpose for which the person is present. No one disputes that Bruschi was 24 Hour's invitee at the time she was injured, which is the most protected status under the PLA. *See* § 13-21-115(7)(a), C.R.S. 2025 ("'Invitee' means a person who enters or remains on the land of another to transact business in which the parties are mutually interested . . . ."). Thus, Bruschi could recover against 24 Hour "for damages caused by [24 Hour's] unreasonable failure to exercise reasonable care to protect against dangers [that 24 Hour] actually knew about or should have known about." § 13-21-115(4)(c)(I).

¶ 25    With these authorities in mind, we return to Bruschi's particular arguments.

## B.    Analysis

¶ 26    Bruschi contends that the waiver was not enforceable because (1) it violated public policy as interpreted by Colorado's appellate courts; (2) its language did not extend to her use of 24 Hour's bathroom facilities or to the care 24 Hour provided immediately following her fall; and (3) if interpreted as 24 Hour urges, the waiver would effectively obviate the duties landowners owe to invitees under the PLA.  § 13-21-115.

### 1.    Public Policy Argument

¶ 27    Bruschi argues that the waiver is inconsistent with the *Jones* public policy factor and is therefore unenforceable.  She states that "a commercial gym serving seniors through health-care programs may not contract away its duty to maintain safe walkways."  But aside from loose references to "senior-based Medicare fitness programs," she does not provide us with the details of how the program works and why it renders the waiver contrary to public policy.  Moreover, Bruschi does not point us to any contractual, statutory, or regulatory provision that would prevent a fitness

15

center that provides services to senior citizens from requiring its members to waive any liability claims brought under the PLA.

¶ 28    The absence of any citation to specific regulatory or statutory requirements distinguishes this case from *Miller*. Recall that in *Miller*, the plaintiffs grounded their negligence per se argument on specific state statutes and rules that were promulgated thereunder. *See Miller*, ¶¶ 27-32. But Bruschi points to no statute or regulations concerning the provision of services to senior citizens or the maintenance of public entryways that 24 Hour violated. Moreover, the claims at issue in *Miller* were based on negligence theories, not PLA claims.

¶ 29    And Bruschi fails to distinguish the many Colorado cases that have applied the supreme court's holding that waivers in the recreational services context do not violate public policy. True, a number of these cases — including *Chadwick*, *Miller*, and *Jones* — did not involve premises liability claims. Moreover, *Stone* and *Shive*, which did involve PLA claims, found the exculpatory clauses did not extend to the particular activities at issue in those cases. Thus, neither *Stone* nor *Shive* was required to reach the public policy question, as *Shive* expressly says. *Shive*, ¶ 47.

¶ 30    As 24 Hour notes, *Shive* does state that the division agreed "that the exculpatory clause waives liability for claims arising from a slip and fall that occurred within its 'facilities' — the recreational spaces located inside its building, such as a gym floor, a basketball court, a pool deck, or a wet locker room floor." *Id.* at ¶ 43.  24 Hour seizes on this language to suggest that the waiver is not contrary to public policy and encompasses any use of its interior facilities.  By contrast, Bruschi seems to rely on *Shive*'s statement that "the mere reference to 'premises liability' in the exculpatory clause does not overcome the clause's clear limiting language or expand its scope to cover claims arising from injuries sustained outside the club building." *Id.*  Bruschi suggests that her injury — suffered while proceeding through the lobby to the exit — was more akin to Shive's injury.

¶ 31    But recall that the division in *Shive* ultimately concluded that the waiver language did not unambiguously extend to injuries suffered outside its building.  Thus, the quoted language from *Shive*, including any suggestion that it was consistent with public policy, was arguably dicta.  And, most critically, the division in *Shive* expressly declined to reach the question of whether the waiver

17

was contrary to public policy. *Id.* at ¶ 47. For these reasons, we conclude that *Shive* is not instructive on whether the waiver violates public policy.

¶ 32 Finally, Bruschi does not develop an argument that the reasoning of *Miller*, *Chadwick*, and *Jones* — permitting the use of exculpatory clauses in connection with recreational services — does not apply to PLA claims. *See Stone*, ¶ 17 ("[C]ourts have consistently deemed recreational services to be neither essential nor a matter of practical necessity."). And we cannot make such an argument for her. *See Cali*, ¶ 34; *see also Dep't of Nat. Res. v. 5 Star Feedlot, Inc.*, 2021 CO 27, ¶ 39 n.15 ("[The] adversarial system of justice . . . puts the onus on the parties to frame the issues to be decided while assigning to courts the role of neutral arbiters of the matters raised by the parties."). Therefore, Bruschi has not presented — and we may not create — a developed argument for declining to apply the *Jones* factors to enforce an exculpatory clause that waives premises liability claims.

2. The Release Covers Bruschi's Fall and Treatment

¶ 33 Next, Bruschi appears to argue that the release should not be extended to her use of 24 Hour's bathroom after completing her

18

treatment at iCryo. True, as Bruschi notes, the undisputed facts seem to support the conclusion that she had completed her workout at 24 Hour. Recall that Bruschi then walked into the 24 Hour entryway and over to iCryo. She completed her iCryo appointment and then returned to 24 Hour to use the bathroom. Her injury occurred after she exited the bathroom and walked toward 24 Hour's exit. Thus, we agree with her that her injury was not suffered during, or incident to, her workout program.

¶ 34    But, unlike the exculpatory clause at issue in *Stone*, the waiver at issue in this case stated that Bruschi released all her PLA claims for injuries resulting from her "use of 24 Hour's facilities" whether "related to exercise or not, and whether using 24 Hour's services on its premises or not." So even though Bruschi was not using 24 Hour's workout facilities when she was injured, her injuries still arose from her "use of 24 Hour's facilities" and are therefore covered by the release. And unlike the plaintiff in *Shive*, Bruschi's injury occurred within 24 Hour's facilities rather than on the exterior sidewalk.

¶ 35    For similar reasons, we reject Bruschi's contention that the waiver did not cover whatever negligence or "unreasonable failure to

19

exercise reasonable care to protect against dangers [24 Hour] actually knew about or should have known about," § 13-21-115(4)(c)(I), that may have existed with respect to the treatment that 24 Hour employees provided or failed to provide after she fell. The waiver expressly extended to any "actions or inactions . . . of 24 Hour or anyone on 24 Hour's behalf." This language encompasses damages or complications Bruschi suffered because of the treatment or lack of treatment provided to her at 24 Hour.

¶ 36    We conclude that the waiver encompassed the activities Bruschi was engaged in when she suffered her injuries, and the care provided to her by 24 Hour staff after her fall.

### 3.    Obviating the PLA

¶ 37    Finally, Bruschi argues that enforcing the waiver to bar her claim would render meaningless and unenforceable the specific duty that the General Assembly has imposed on a landowner such as 24 Hour who receive a financial gain from inviting members of the public to use their facilities and services. Recall that the PLA imposes liability on a landowner for damages caused to an invitee "by the landowner's unreasonable failure to exercise reasonable care to protect against dangers the landowner actually knew about

20

or should have known about." § 13-21-115(4)(c)(I). Clearly, Bruschi has alleged sufficient facts that, if proved, may support a conclusion that her injuries resulted from 24 Hour's unreasonable failure to use reasonable care to protect against a risk about which it knew or should have known. *See id.* Absent the waiver, she has asserted facts that would allow her to proceed with a PLA claim. This reality underlies her argument that the waiver effectively obviates the PLA duty owed to her as an invitee.

¶ 38     Bruschi's argument makes an important point. And her citation to *Walters* brings that point home. *Walters* recognized that the "expansive scope of the exculpatory clause" at issue there, if applied literally, "would eviscerate the common law duty of care owed by defendant to its invitees, regardless of the nature of the business activity involved." 96 A.3d at 328. As the New Jersey Appellate Division noted, such a result is, at least arguably, "inimical to the public interest because it would transfer the redress of civil wrongs from the responsible tortfeasor to either the innocent injured party or to society at large, in the form of taxpayer-supported institutions." *Id.*

¶ 39    But the *Walters* opinion makes these observations and declines to enforce the exculpatory clause while interpreting a common law negligence claim and defenses thereto. But the Colorado General Assembly has, as previously noted, chosen to abrogate common law negligence claims against landowners.

¶ 40    When interpreting the breadth of common law negligence claims, courts have broad discretion and authority to consider public policy arguments. *See Jefferson Cnty. Sch. Dist. R-1 v. Justus*, 725 P.2d 767, 769 (Colo. 1986) ("The determination of whether a duty of care exists in a particular situation involves weighty policy questions whose resolution requires consideration of a number of different factors."). But, as noted, the General Assembly chose to usurp landowners' common law duties and replace them with the PLA. *Vigil*, 103 P.3d at 330. So we are not interpreting a common law duty, but rather a statutory duty imposed by the General Assembly through its adoption of the PLA. In these circumstances, the breadth of our ability to consider policy arguments is more circumspect.

¶ 41    As Bruschi notes, strong public policy arguments exists that suggest it may indeed be inimical to the public interest to permit

the use of an exculpatory clause to effectively abrogate the general duty that the General Assembly has imposed on landowners who invite people onto their property for commercial gain. And there may well be countervailing public policy arguments to support such broad exculpatory clauses in the context of invitees. But given its adoption of the PLA, the General Assembly is the proper body to consider these broad policy arguments.

¶ 42    Finally, we note that the General Assembly is presumably aware of the decisions of Colorado's appellate courts. *See LaFond v. Sweeney*, 2015 CO 3, ¶ 12 ("Courts presume the legislature is aware of its own enactments and existing case law precedent."). This includes the long line of cases holding that the use of exculpatory clauses in the context of recreational services does not violate public policy. And the General Assembly has demonstrated its capacity to address what type of liability releases are permissible or not permissible in other contexts. *See, e.g.*, § 13-22-107(3)-(4), C.R.S. 2025 (A parent may release a child's prospective claim for negligence but not claims based on a "willful and wanton act or omission, a reckless act or omission, or a grossly negligent act or omission.").

23

¶ 43 To date, the General Assembly has not chosen to limit the use of exculpatory clauses in the context of commercial recreational facilities, whether those facilities are used by senior citizens or anyone else. In this context, we conclude that the public policy concerns surrounding whether an exculpatory clause should be permitted to effectively obviate a landowner's duty to an invitee is entrusted to the General Assembly rather than the courts.

## III. Disposition

¶ 44 We affirm the district court's judgment.

JUDGE FREYRE and JUDGE BROWN concur.